UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| MARK A. STARKEY, | ) | |
|---|---|---|
| Petitioner, | ) | |
| v. | ) | No. 4:15CV728 RWS |
| HEATH SPACKLER, | ) | |
| Respondent, | ) | |

**MEMORANDUM AND ORDER**

Mark Starkey petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. All of the grounds raised in the petition are wholly frivolous. As a result, I will dismiss this action without further proceedings. *See* 28 U.S.C. § 2254, Rule 4.

### Background

The Court takes the facts of this case from the Missouri Court of Appeals:

[Starkey] was married to Joanna Wilson ("Joanna") for twenty-one years, during which time they lived in Texas. Joanna left Texas in late 2007 or early 2008 and moved to St. Louis. She traveled back and forth from St. Louis to her hometown of Poplar Bluff and reestablished a relationship with Rodney Barker ("Barker"), who had known Joanna in high school. Joanna and Barker were having an affair. [Starkey] and Joanna eventually divorced.

In January 2008, [Starkey] called Barker and asked Barker to describe his sexual relationship with Joanna. Barker told [Starkey] not to call him anymore, but [Starkey] kept calling. The frequency of [Starkey]'s calls increased to the point of approximately forty phone calls within a twenty-four-hour time period. [Starkey] left messages on Barker's answering machine, yelling and using vulgar language. [Starkey] threatened to blow Barker's head off, and threatened to send people to rape Barker's grandchildren. Barker also received letters from [Starkey] with pornographic photographs and vulgar language. Barker complained to the police in February and April 2008.

**Stalking the Prosecutors**

The prosecuting attorney of Butler County, Kevin Barbour ("Prosecutor"), and his office filed charges of aggravated stalking against [Starkey]. Judge John

Bloodworth ("Judge Bloodworth") signed a warrant for [Starkey]'s arrest. He later recused himself at the request of [Starkey] and defense counsel because he went to high school with Barker, but did not socialize with him or know where Barker lived. Judge Bloodworth has a practice of disclosing the relationship if he knows a party to the case, and recusing if he is requested to do so.

In May 2008, [Starkey] was arrested in Texas on the aggravated stalking charges involving Barker, but was placed on a twenty-four hour hold and was then released on bond. The charges were dismissed after a preliminary hearing. An assistant prosecuting attorney for Butler County, Paul Oesterreicher ("Asst. Prosecutor"), handled the preliminary hearing. The charges were re-filed in October 2008. Judge Bloodworth signed the warrant. [Starkey] was arrested again, and again, was released on bond.

In October 2008, the Prosecutor's Office began receiving calls from [Starkey]. Kendra Hampton Gore ("Gore"), the receptionist, generally took the calls, but Cheryl Link ("Link"), the Prosecutor's secretary, also answered the phone. [Starkey] identified himself as "Mark Starkey" and Gore could recognize his voice on calls thereafter. Link also answered calls from [Starkey], who identified himself. [Starkey] would ask to speak with Prosecutor or Asst. Prosecutor, but the receptionist would take a message rather than putting the calls through. [Starkey] used vulgar language toward the staff. The secretaries began keeping a log of the calls, including calls on November 15, 17, 18, 21, and 24, 2008. On November 24, 2008, [Starkey] stated that if Prosecutor did not call off the warrants and if the judge did not get off his back, he was going to blow up the building. Link told Prosecutor and Asst. Prosecutor about the call. On the same day, less than ten minutes later, Gore took a call in which [Starkey] said to "tell [Prosecutor] and [Asst. Prosecutor] to report themselves now" or they would be killed. He also used vulgar language. Gore communicated the message to Prosecutor and Asst. Prosecutor. Within the same hour, [Starkey] called Link again, regarding "getting ready to take a magic carpet ride out of this world," and then [Starkey] hung up the phone. Link decided to try to record as many of the calls as she could. One such call stated "somebody" would get killed.

In addition to the phone calls, the Butler County Prosecuting Attorney's Office received numerous faxes, totaling seventy-two pages, from one Texas phone number, (903)432–4332, from October 27 through November 21, 2008. Some had [Starkey]'s name in them. Asst. Prosecutor was aware of all of the faxes, some of which he pulled off the fax machine himself. In the faxes, [Starkey] claimed the proceedings against him were unlawful, that Prosecutor, Asst. Prosecutor, and Judge Bloodworth were perpetrating a fraud and should report themselves to federal authorities and go to jail, and the case should be dismissed. Some faxes took issue with Judge Bloodworth's jurisdiction and involvement in the case. [Starkey]'s demands were in letter form or "press release" form rather than legal pleadings. One fax referred to the saying, "don't mess with Texas," while others used profanity and warned, "Gonna be a tough week boys . . .," referring to hillbilly lawyers. Link observed the faxes all came from the same area code and

collected them in a file folder. She kept Prosecutor and Asst. Prosecutor informed on the matter.

Asst. Prosecutor also received two copies of a letter containing partially nude photographs of Joanna and referring to "devil play" in two separate envelopes addressed to Asst. Prosecutor's wife. The envelopes had return address labels with Barker's name and address. The same copies were sent in envelopes to the Prosecutor's Office, Prosecutor's wife at their home address, Judge Bloodworth and his wife separately, and the courthouse.

Asst. Prosecutor's family received at least one message on their answering machine. Asst. Prosecutor was concerned that [Starkey] had managed to find his address and home phone number, and was aware of the calls containing [Starkey]'s threats to kill him. He made arrangements for his children to stay with his in-laws if he knew that [Starkey] was coming to town.

Prosecutor also was aware of the faxes, letters, and phone calls coming into the Prosecuting Attorney's Office. He received at least one call at his home as well. Although he hung up, the phone continued to ring every ten to fifteen minutes all night long, for six or seven hours. In one phone call, [Starkey] asked questions about Prosecutor's ex-wife and his father. Prosecutor listened to most of the recorded calls, including one that stated he would be killed if he didn't call off the warrants. Prosecutor was aware of the threats to kill him, as well as the threat to blow up the building. He was "quite concerned" about the threats and kept a gun close by him in his truck. He gave guns to his wife and son; the son kept the gun at his own home. Prosecutor also had safety glass and a panic button installed in his office, he had police officers in his office and escorting him across the street to the courthouse on occasion. An officer followed Prosecutor all day at court appearances when he believed [Starkey] was going to appear. Prosecutor thought [Starkey] seemed very determined and obsessive.

[Starkey] pled guilty to the federal charge of using an instrument of commerce to threaten to destroy a building by means of an explosive. He was sentenced to ten months in federal prison.

**Stalking Judge Bloodworth**

In addition to the communications [Starkey] made with the Prosecuting Attorney's Office, [Starkey] also called and identified himself to the Butler County Circuit Clerk's Office clerks on numerous occasions. When he was not transferred to Judge Bloodworth, he called the clerks vulgar names. [Starkey] sent many faxes to Judge Bloodworth, one of which purported to be an arrest warrant for Judge Bloodworth, Prosecutor, and Asst. Prosecutor. Another fax warned, "better buckle up scum ... gonna be a tough week boys," also addressing the victims as hillbilly lawyers. Other faxes referenced Judge Bloodworth's male anatomy as well as his wife.

[Starkey] also called Judge Bloodworth's home and left a message on his answering machine. [Starkey] stated, "There's gonna be a lot of people needing to go to medical facilities if John Boy Bloodworth don't remove his fraudulent warrants," and concluded with profanities. After the call, Judge Bloodworth and his wife were worried about their family's safety. They had one son, who was instructed to lock the doors and not to open them until he looked outside to see who was there. Panic buttons were installed in the circuit clerk's office and staff was instructed to push the button if [Starkey] came to the window. [Starkey]'s picture was posted in the clerk's office as well. Judge Bloodworth was aware of the phone calls, letters and faxes received from [Starkey].

On December 7, 2009, the Missouri Attorney General's Office ("State"), acting as Special Prosecutor, filed a complaint in the Circuit Court of Butler County, charging [Starkey] with four counts of aggravated stalking as to Barker, Prosecutor, Asst. Prosecutor, and Judge Bloodworth, respectively. [Starkey] filed numerous pro se motions to dismiss the case, including a motion to dismiss for lack of jurisdiction, or to disqualify the prosecutor, which were subsequently denied. The trial court granted [Starkey]'s motion for a change of venue to St. Louis County.

A trial took place from July 25 through 28, 2011, in the Circuit Court of St. Louis County. [Starkey] filed motions for judgment of acquittal at the close of the State's evidence and at the close of all of the evidence, which motions were denied. The jury found [Starkey] guilty of four counts of aggravated stalking, and the trial court sentenced [Starkey] to consecutive sentences of four years' imprisonment on each count.

*Missouri v. Starkey*, 380 S.W.3d 636, 638-41.

## Grounds for Relief

In the instant petition, petitioner raises five grounds for relief. First, he argues that the trial court "lacked jurisdiction over Interstate Commerce and has acted outside its authorized jurisdictional parameters." Second, he argues that the state lacked jurisdiction over him because he was a "foreign resident" living in Texas when the crimes occurred. Third, he argues that Missouri's stalking statute was preempted by the "interstate stalking statute." Fourth, he argues that the stalking statute he was convicted under had been repealed. Finally, he argues that the trial court "violated Article IV(c) Interstate Agreement on Detainers."

**Standard**

In the habeas setting, a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions." *Lomholt v. Iowa*, 327 F.3d 748, 751 (8th Cir. 2003). Under this standard, a federal court may not grant relief to a state prisoner unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or . . . decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. Finally, a state court decision involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record. 28 U.S.C. §2254(e)(1); *Ryan v. Clarke*, 387 F.3d 785, 790 (8th Cir. 2004).

**Discussion**

1.  *Ground One*

In ground one, petitioner argues that the trial court "lacked jurisdiction over Interstate Commerce and has acted outside its authorized jurisdictional parameters." Petitioner argues that

5

the Commerce Clause of the United States Constitution barred prosecuting him because he was in Texas when he committed the crimes.

On direct review, the Missouri Court of Appeals cited Revised Statute § 541.191.1(1), which provides that "This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which such person is legally accountable if: (1) Conduct constituting any element of the offense or a result of such conduct occurs within this state." *Starkey*, 380 S.W.3d at 646. The court further stated:

> While harassment is the conduct constituting the crime of aggravated stalking, it is defined as conduct directed at a specific person, and causes that person to be frightened, intimidated, or emotionally distressed. Section 565.225.3; 565.225.1(3). Thus, the elements of the crime include the conduct that was carried out by Appellant in Texas as well as the fright, intimidation, or emotional distress which was intended for and occurred in [Starkey]'s targets in Missouri thereafter. Moreover, Section 541.191.1(1) does not require that the result be an element of the offense. The statute requires simply the result of the conduct constituting the offense occur in Missouri. The evidence on the record clearly shows the results of [Starkey]'s actions directed toward each of these four individuals for which he was charged with aggravated stalking occurred in the state of Missouri. The concern, extra precautions, and overall emotional distress of Barker, Judge Bloodworth, Prosecutor, and Asst. Prosecutor all took place in Missouri.

*Id.*

Petitioner's argument is frivolous. The Commerce Clause does not apply to Missouri's jurisdiction over crimes committed within its borders, even if the perpetrator was located in another state when the crime occurred. Furthermore, the appellate court's application of the law was not unreasonable or contrary to clearly established federal law. As a result, petitioner is not entitled to relief on this ground.

2. *Ground Two*

In ground two, petitioner argues that the state lacked jurisdiction over him because he was a "foreign resident" living in Texas when the crimes occurred.

This ground is duplicative of ground one and is dismissed for the same reasons.

6

3.  *Ground Three*

In ground three, petitioner argues that Missouri's stalking statute was preempted by the federal "interstate stalking statute."

Petitioner's claim is unsupported. There are no Supreme Court cases holding that the interstate stalking statute, 18 U.S.C. § 2261A, preempts state criminal statutes. As a result, petitioner is not entitled to relief on ground three.

4.  *Ground Four*

In ground four, petitioner argues that the stalking statute he was convicted under had been repealed.

In discussing this claim, the Missouri Court of Appeals found petitioners argument to be incorrect and explained the amendment to the statute:

> When considering statutory amendments, the court presumes that the legislature intended to accomplish some purpose, one of which may be to clarify and detail an existing law. *Bank of Urbana v. Wright*, 880 S.W.2d 921, 924 (Mo.App. S.D.1994). The legislature removed from the definition of "credible threat" the language that it "may include a threat communicated to the targeted person in writing, including electronic communications, by telephone, or by the posting of a site or message that is accessible via computer." Section 565.225.1(2), RSMo Cum.Supp.2007. It added an element that the target of the threat may fear for the safety of his family, household members or animals, as well as his own safety. Section 565.225.1(2). The amended statute clarified that a threat must be against the life of, or to cause physical injury to, or the kidnapping of, the target victim or his family, household members, or animals. Section 565.225.1(2). Thus, the elimination of the language Appellant now contests merely eliminated examples of what the credible threat may include. The legislature made clear in both versions of the statute that the form of communication by which a threat may occur is unlimited. Section 565.225.1(2). The elimination of the example in Section 565.225.1(2) does not eliminate the telephone, letters, or faxes from the means by which a credible threat can be made, as Appellant contends.
>
> The threat here was one by which Appellant communicated with intent to cause Judge Bloodworth to reasonably fear for his safety or the safety of his family, who was referenced in Appellant's communications. The evidence was sufficient to submit aggravated stalking of Judge Bloodworth to the jury to find whether Appellant was guilty beyond a reasonable doubt. Appellant's first point is denied.

7

*Starkey*, 380 S.W.3d at 643-44.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see Poe v. Caspari, 39 F.3d 204, 207 (8th Cir. 1994) ("Jurisdiction is no exception to the general rule that federal courts will not engage in collateral review of state court decisions based on state law."); Watts v. Bonneville, 879 F.2d 685, 687 (9th Cir. 1989) (alleged violation of state sentencing statute not cognizable in federal habeas proceedings). Furthermore, a state prisoner "may not . . . transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996). The claim in ground four refers only to a state court determination of a matter of state law. It is not cognizable in these proceedings. As a result, petitioner is not entitled to relief on this ground.

    5.    *Ground Five*

In ground five, petitioner argues that the trial court "violated Article IV(c) Interstate Agreement on Detainers."

Under 28 U.S.C. § 2254(a), a district court may only entertain a petition for writ of habeas corpus if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." In other words, grounds that do not state a constitutional issue are not cognizable in a federal habeas petition. E.g. Gee v. Groose, 110 F.3d 1346, 1351-52 (8th Cir. 1997). Ground five does not allege a constitutional violation. As a result, petitioner is not entitled to relief on this ground.

**Certificate of Appealability**

For these reasons, petitioner is not entitled to federal habeas relief. Furthermore, petitioner has failed to make a substantial showing of the denial of a constitutional right, which requires a demonstration "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." Khaimov v. Crist, 297 F.3d 783, 785 (8th Cir. 2002) (quotation omitted). Thus, the Court will not issue a certificate of appealability. 28 U.S.C. § 2253(c).

Accordingly,

**IT IS HEREBY ORDERED** that the petition for writ of habeas corpus is **DENIED**, and this action is **DISMISSED**

**IT IS FURTHER ORDERED** that the Court will not issue a certificate of appealability.

A Judgment will be filed separately.

Dated this 11th day of May, 2015.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE